# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYNARD DAVIS,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No. 5:21-cv-01475-CAS (SK)<br><br>**REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>**[ECF 64]** |

## I.
## INTRODUCTION

Plaintiff Raynard Davis sues under the Federal Tort Claims Act (FTCA) for assault, battery, and negligence.  Plaintiff claims that Bureau of Prisons (BOP) correctional officers at the United States Penitentiary in Victorville (USP Victorville) committed a series of assault and battery torts one day in September 2019, causing a seizure and requiring emergency hospitalization. He also claims that the BOP paramedic who tended to him the same day committed malpractice in how he administered fluids to help stabilize plaintiff right after the alleged assault and battery incidents.  Defendant United States moves for summary judgment on all claims.  For the assault and battery claims, the government argues that it is entitled to judgment as a matter of law because plaintiff's allegations are conclusory and unsubstantiated by evidence outside his self-serving claims and contradictory testimony.  For the medical malpractice claim, the government argues (among other things) that plaintiff has presented no medical expert

evidence establishing the predicate standard of care needed to prove the breach and causation elements for negligence. The court recommends that defendant's motion be granted in part and denied in part.

On the one hand, the summary judgment record reveals that plaintiff has adduced enough evidence creating a genuine dispute of material fact over whether he was assaulted and battered on September 27, 2019 by BOP correctional officers as plaintiff claims. Construed with all permissible inferences in plaintiff's favor, the evidence reveals genuinely conflicting accounts of whether BOP officials deployed pepper spray when plaintiff refused to submit to a strip search, forcibly removed him from his cell with ambulatory restraints for his noncompliance, and then beat him in an isolated shower area including by banging his head against the shower wall. The choice between those divergent accounts depends on a classic credibility contest that only a factfinder can judge at trial.

On the other hand, the same summary judgment record reveals that plaintiff has adduced none of the threshold expert evidence or objective medical testimony needed to establish the indispensable breach and causation elements of his negligence claim. Whether the BOP paramedic breached the prevailing medical standard of care for the specialized emergency procedure he used to administer fluids after petitioner had seized and fallen unconscious—an intraosseous infusion procedure—is not an issue that can be decided based on lay testimony or speculative and conclusory hearsay. Nor has defendant presented any objective and independent expert testimony that plaintiff can rely on derivatively to establish the pertinent standard of care for his negligence claim. In any event, the absence of such expert evidence inures to defendant's benefit because it is plaintiff's burden to come forward with admissible evidence establishing the pertinent standard of care for his medical malpractice claim.

## II.

## BACKGROUND

The following material facts are undisputed or not genuinely disputable.[1] Plaintiff was incarcerated at USP Victorville from April 2019 to November 2020.[2] (UF 3). He has a history of suicidal behavior and self-injury, including suicide attempts, as well as a history of seizures. (UF 7, 13; Davis Depo. at 12–14). On September 27, 2019, plaintiff was housed in a suicide watch cell. (UF 5). That day, three BOP correctional officers including Jacob Martini pepper sprayed plaintiff inside his cell, removed him in ambulatory restraints, and transported him to the special housing unit (SHU) showers. (UF 11–12; Verif. Compl. at 8; Martini Decl. ¶¶ 20–22). Plaintiff had a seizure in the SHU showers and collapsed unconscious. (UF 16–17). He was taken to the prison medical facility where he was seen by a BOP paramedic, Isaac Gomez. (UF 18–19; Gomez Rpt. at 14). None of these events inside the prison that day was captured by any video cameras.

To help stabilize plaintiff, paramedic Gomez used an intraosseous (IO) infusion procedure to administer fluids. (UF 20–21; Gomez Rpt. at 14).

---

[1] The summary judgment record is comprised of plaintiff's Verified Complaint ("Verif. Compl.") at ECF 1; defendant's Uncontroverted Statement of Facts ("UF") at ECF 64-4; the Declaration of Jacob Martini ("Martini Decl.") at ECF 64-2; the Declaration of Isaac Gomez ("Gomez Decl.") at ECF 64-1; defendant's selected excerpts from the Deposition of Raynard Davis ("Davis Depo.") at ECF 64-3; plaintiff's prison Administrative Claim ("Admin. Cl.") attached to defendant's moving papers at ECF 64-3; Officer Martini's Incident Report ("Martini Rpt.") attached to defendant's moving papers at ECF 64-3; Paramedic Gomez's Medical Report ("Gomez Rpt.") attached to plaintiff's opposition papers at ECF 71; the September 2019 hospital records from Desert Valley Hospital ("DVH Rec.") attached to plaintiff's opposition papers at ECF 71; and certain 2020 BOP medical records ("BOP Rec.") attached to defendant's moving papers at ECF 64-3. The page references in citations to these materials are based on CM/ECF pagination.

[2] Plaintiff is no longer incarcerated at USP Victorville. When the summary judgment motion was filed, plaintiff was incarcerated at the USP in Beaumont, Texas. (UF 1). Evidently, plaintiff has since been transferred to USP Coleman II in Sumterville, Florida. (ECF 80).

That procedure uses a medical power drill to insert a specialized needle into the tibia bone for direct fluid injection through the vascularity of the bone canal. (Gomez Decl. at ¶ 14). IO infusion is an alternative to intravenous (IV) line placement. (*Id.* at ¶ 12). Plaintiff awoke to witness part of the IO-infusion procedure, soon after which he was stabilized and taken to the nearby Desert Valley Hospital (DVH) for emergency care. (UF 22; Davis Depo. at 20; DVH Rec. at 5). There, DVH medical staff placed an IV in plaintiff's arm, patched up the hole in his leg from the IO-infusion procedure, and treated him for his seizure. (Davis Depo. at 19–20). Plaintiff presented with a visibly swollen black eye, but he told DVH staff that this was a self-inflicted injury from a week before when he had hit his head against a wall. (DVH Rec. at 6, 8; Davis Depo. at 14, 21). Plaintiff was medically cleared and discharged from the hospital the same day. (DVH Rec. at 5–13).

      The remaining material facts are disputed. They center on three questions: why petitioner was forcibly removed from his suicide watch cell, what happened in the SHU showers, and whether (or how many times) the paramedic attempted IV-line placement before the IO-infusion procedure to stabilize plaintiff. On these fact questions, petitioner and the BOP officials offer conflicting accounts. According to plaintiff, BOP officers threatened him while he was in his cell and told him to strip for a body search. (Verif. Compl. at 8). When he refused the strip search, plaintiff says the officers deployed pepper spray through the tray slot. (*Id.*). He says the officers then entered the cell, placed him in ambulatory restraints, and took him to the SHU showers beyond the view of any prison cameras. (*Id.*). Once there, plaintiff alleges that the BOP officers began punching him and slamming his head into the shower wall, which caused him to have a seizure and lose consciousness. (*Id.*; Admin. Cl. at 32). Plaintiff was only jolted awake as

4

Gomez was using a drill for the IO-infusion in his leg. (Verif. Compl. at 8; Davis Depo. at 18). According to plaintiff's testimony, he had contusions and bruises on his forehead afterward. (Davis Depo. at 19, 21).

According to Officer Martini, however, he and other BOP officers saw plaintiff beating his own head against the door of his suicide watch cell, causing visible bleeding. (Martini Decl. ¶¶ 16–18). When their repeated requests that plaintiff stop hurting himself proved futile, the officers pepper sprayed him for his own safety and that of the officers who needed to enter the cell and provide aid. (*Id.* at ¶¶ 19–20). They then escorted plaintiff to the SHU showers, which were the closest ones available to quickly decontaminate plaintiff of the pepper spray. (*Id.* at ¶¶ 21–22). Once there, plaintiff had a seizure and collapsed. (*Id.* at ¶ 23). They immediately took plaintiff to the prison medical facility where he was seen by a paramedic. (*Id.* at ¶¶ 23–24). Officer Martini denies that any officers intentionally harmed plaintiff at any time, much less attacked him in the SHU showers as plaintiff alleges. (*Id.* at ¶¶ 16–23).

For his part, paramedic Gomez remembers little to nothing about the emergency care he provided plaintiff the day of his alleged assault and battery. (Gomez Decl. at ¶¶ 21–23). But according to Gomez's contemporaneous medical report that plaintiff (not Gomez) found, he had made "two attempts at an IV" that were "unsuccessful." (Gomez Rpt. at 14). He then performed the IO-infusion procedure, which he successfully "established on the initial attempt," and administered fluids to help stabilize plaintiff's condition. (*Id.*). Plaintiff argues (in his unsworn opposition papers) that those details in the medical report are a "lie," insisting that Gomez never attempted to place any IV-lines in his arm before resorting to the IO-infusion procedure. (ECF 71 at 3). As he would have been unconscious at the time, plaintiff only later deduced this because he saw no

puncture wounds consistent with failed IV-line attempts and says he was told by Gomez (apparently right after he had regained consciousness) that Gomez "would drill into plaintiff's leg every time plaintiff had a seizure." (Verif. Compl. at 8; DVH Rec. at 5–13). Plaintiff adds that DVH medical staff later had no trouble establishing an IV-line in his arm, and that some there expressed concern about the IO-infusion procedure, questioning whether it had been medically necessary. (Verif. Compl. at 9; Davis Depo. at 18).

Regardless of the dispute over whether—or how many times—Gomez tried an IV-line placement before the IO-infusion procedure, neither plaintiff nor Gomez proffers any independent expert medical evidence or objective medical opinion about the prevailing standard of care for whether—or when—an IO-infusion procedure should be performed on a seized unconscious patient with plaintiff's medical history. Instead, plaintiff merely asserts that he was told by unidentified DVH staff that the specialized IO-infusion procedure was "medical mal-practice [sic]." (Verif. Compl. at 9). Gomez meanwhile just asserts—not having even looked at his own medical notes apparently—that he would have only performed the IO-infusion procedure if it was "medically indicated" according to BOP policy. (Gomez Decl. at ¶¶ 18–20). That policy, Gomez says, generally recommends that IO-infusion be performed after failed IV-line attempts—though he does not say how many, under what conditions, and for what kinds of patients. (*Id.* at ¶ 18). There is no evidence, moreover, of this BOP policy in the record.

### III.
### DISCUSSION

The FTCA provides that the United States may be held liable for torts in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or

omission occurred." 28 U.S.C. § 1346(b); *see Millbrook v. United States*, 569 U.S. 50, 52 (2013). The FTCA waives sovereign immunity for injuries "caused by the negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment," and for claims arising "out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" by an "investigative or law enforcement officer." 28 U.S.C. §§ 1346(b)(1), 2680(h). Defendant United States does not contend that plaintiff's tort claims are barred in any way by the FTCA. Instead, defendant contends that it is entitled to summary judgment on those claims.

Defendant may obtain summary judgment if it "shows that there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if an adequate evidentiary basis exists on which a reasonable jury could find for the nonmoving party. *Id.* at 248. Defendant bears the initial burden of identifying those portions of the record, together with sworn declarations, that it believes show the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If defendant meets this initial burden, the burden shifts to plaintiff to show with specific facts, not mere conclusory allegations, the existence of a genuine dispute of material fact. *See id.* at 249, 256. In determining whether any genuinely disputed issue of material fact exists, the court must view all the evidence in the light most favorable to plaintiff and draw all reasonable inferences supported by that evidence in his favor. *See Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). Because plaintiff is a pro se litigant, the court must also construe his pleadings liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

But that does not mean the court must "scour the record in search of a genuine issue of triable fact" or relieve plaintiff of his obligation "to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996). And if defendant shows that plaintiff "does not have enough evidence of an essential element of [his] claim . . . to carry [his] ultimate burden of persuasion at trial," *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000), plaintiff must go beyond the pleadings and designate specific facts showing that there remains a genuine dispute. *See Celotex*, 477 U.S. at 324 (1986). His burden of production "is not a light one." *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021). He must show more than a scintilla of evidence or metaphysical doubt about the material dispute. *See id.* at 897–98. If "the record taken as a whole could not lead a rational trier of fact to find for" plaintiff on a given claim, summary judgment must be entered for defendant on that claim. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

A. <u>Plaintiff's Assault and Battery Claims Raise Genuine Disputes of Material Fact Inappropriate for Summary Judgment</u>

The parties do not disagree about the elements needed to prevail on plaintiff's assault and battery claims under the FTCA. To establish liability for the tort of assault under California law, plaintiff must establish that (1) the correctional officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to plaintiff that the officers were about to carry out the threat; (3) plaintiff did not consent to the officers' conduct; (4) plaintiff was harmed; and (5) the officers' conduct was a substantial factor in causing the plaintiff's harm. *See Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012). To establish liability for the tort of battery under California law, plaintiff must establish that (1) officers touched him or

caused him to be touched with the intent to harm or offend him; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by the officers' conduct; and (4) a reasonable person in plaintiff's situation would have been offended by the touching. *See id*; *see also Fifer v. United States*, 649 F. App'x 426, 427 (9th Cir. 2016) (noting essentially same elements for FTCA battery claim under Arizona law).

      Nor does there appear any dispute over many of the material facts concerning the initial instances of force that plaintiff experienced: the parties do not disagree that plaintiff was pepper sprayed, forcibly removed from his cell, and physically restrained for transport to the SHU showers. And viewed with all permissible inferences in plaintiff's favor, the evidence is adequate for a jury to conclude that plaintiff consented to none of those uses of force. The only material questions left, then, concern what necessitated those force events in the first place and what happened in the SHU showers afterward to cause plaintiff's seizure and collapse. Contrary to defendant's arguments, the answers to those factual questions are genuinely disputed.

      For starters, the conflicting accounts between plaintiff and Officer Martini create a textbook dispute of material facts unsuitable for summary judgment. *See Sullivan v. United States*, 2020 WL 7049551, at *4 (D. Or. Nov. 30, 2020) ("[W]hether the jury will believe [plaintiff] or the officers is not a question properly determined by the Court on a motion for summary judgment."). Officer Martini says that plaintiff was removed from his suicide watch cell because he was hurting himself, even causing bleeding from his head. (Martini Decl. ¶¶ 16–20). Plaintiff says that he was threatened and forcibly removed from the cell for refusing an unwanted strip search. (Verif. Compl. at 8). Officer Martini says that any injuries to plaintiff's head were self-inflicted inside his cell before anyone touched him and denies that anyone attacked plaintiff outside his cell, let alone in the SHU showers.

9

(Martini Decl. ¶¶ 18, 23). Plaintiff says that officers punched him in the SHU showers and banged his head against the wall. (Verif. Compl. at 8; Davis Depo. 19). Those are nothing if not genuinely disputed material facts. *See, e.g.*, *Lee v. Pfister*, 2015 WL 13907563, at *5 (C.D. Cal. Mar. 17, 2015) ("Plaintiff's evidence is that defendant slammed his hands in the food slot door many times; defendant's evidence is that he did not slam plaintiff's hands in the food slot door at all. It is difficult to conceive of a more material factual dispute than that one."); *Walker v. Varela*, 2015 WL 13915637, at *10 (C.D. Cal. Jan. 21, 2015) ("[T]he fact that there are conflicting declarations that go directly to plaintiff's claim that he was pepper sprayed a second time presents a genuine issue for the trier of fact.").

It is thus a non sequitur for defendant to argue that plaintiff's assault and battery claims must be rejected as a matter of law because they are substantiated only by plaintiff's anticipated testimony but uncorroborated by Officer Martini's. (ECF 64 at 3). On summary judgment, that tie between conflicting witness accounts must be broken in favor of the nonmoving party. Thus, the court may consider the facts in plaintiff's verified complaint as evidence to preclude summary judgment. *See Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), *as amended*, 135 F.3d 1318 (9th Cir. 1998); *see also Allen v. Rivera*, 2013 WL 1832679, at *5 (E.D. Cal. May 1, 2013) ("[A]llegations made in Plaintiff's verified complaint are sufficient in and of themselves to establish a genuine dispute as to the material facts."). And plaintiff's sworn assertions cannot be rejected as intrinsically self-discrediting or entirely unworthy of belief simply because defendant claims they are "self-serving." *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015) (party's "declarations are often self-serving, and this is properly so because the party submitting it" uses "the declaration to support his or her position"); *Rodriguez v. Airborne Express*, 265 F.3d 890,

902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."). By that logic, Martini's sworn statements cannot be credited either.

Defendant's assertion that plaintiff's account of events is blatantly contradicted by other evidence is also misplaced. The cases defendant cites for this argument all involved video evidence permitting objective assessment. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (videotape footage "so utterly discredited" plaintiff's "version of events"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants, . . . so long as their version of the facts is not blatantly contradicted by the video evidence[.]"). There is no such objective video evidence here. At most, there may be inconsistencies in plaintiff's testimony and apparent contradictions with some extrinsic evidence. But plaintiff's version of events need not be unimpeachable to survive summary judgment; they need only be adequate to permit a jury to find in his favor. Of course, that means plaintiff's credibility can be tested by inconsistencies or contradictions in the evidence, but so too can the credibility of the government's witnesses (including Officer Martini). It is for the jury at trial, not the court at summary judgment, to resolve that credibility contest. *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005).

Besides, the government cannot have it both ways here: either plaintiff's version of events is unworthy of belief because it is so conveniently one-sided, or it is utterly unbelievable because it is objectively irreconcilable with contrary evidence. If it is somewhere in between those extremes, as it is here, a genuine dispute of material fact necessarily exists. *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). If anything, plaintiff's credibility

11

is possibly enhanced—not fatally undermined—by some of his admissions against interest. Plaintiff admits that he hit his own head against a wall before, making Officer Martini's telling of events plausible. (Davis Depo. at 14, 21). And while it would have no doubt been in his interest to blame BOP officers for the visible black eye he had at the hospital, plaintiff said instead that it was a self-inflicted injury from a week before. Nor is there good reason to think that plaintiff's account is fabricated just because his DVH admission records state that he "had purposefully been banging his head against the wall in the shower." (DVH Rec. at 5). Nothing in those records indicates whether that was taken from a statement that plaintiff made or from one that hospital staff was told.[3] What's more, if that statement reflected the truth, the court would have expected Officer Martini to say that plaintiff was banging his head against the wall in the SHU showers, not in his suicide watch cell. Besides, those records are not unfailingly accurate—they also state, for example, that plaintiff returned to his "room" *before* having a seizure, even though everyone agrees that plaintiff's seizure happened in the SHU showers. (DVH Rec. at 5).

      Finally, defendant suggests that plaintiff's account is intrinsically suspect because the emergency hospital records reveal a conspicuous lack of information about any serious head injuries. He was discharged the same day, after all. But an inmate who claims he was "gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). Just because, in defendant's estimation, plaintiff's injuries could have been worse "do[es] not require a rejection of

---

[3] According to the medical record, plaintiff was discharged with law enforcement officers, and plaintiff testified that "two correctional officers" always stayed with him at the hospital. (Davis Depo. at 20; DVH Rec. at 8).

12

his allegations." *Hardney v. Warren*, 2022 WL 17417815, at *8 (E.D. Cal. Dec. 5, 2022). Besides, if the hospital evidence is construed that way in defendant's favor (contrary to what summary judgment allows), it can equally call into doubt Officer Martini's factual claim that plaintiff was so badly hurting himself inside his cell—drawing blood from his head—that it forced them to intervene with pepper spray. (Martini Decl. ¶ 18). But it would be no less premature to assess the weight of Officer Martini's testimony now than it is to prejudge the persuasiveness of plaintiff's claims. *See Anderson*, 477 U.S. at 255.

### B. Plaintiff Has Adduced No Objective Evidence of the Relevant Standard of Care Needed to Prevail at Trial for Medical Malpractice

To establish liability for medical malpractice, plaintiff must prove that (1) the paramedic had "a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise;" (2) the paramedic breached that duty; and (3) the breach caused plaintiff injury. *Johnson v. Superior Ct.*, 143 Cal. App. 4th 297, 305 (2006). "The standard of care in a medical malpractice case" is that "degree of skill, knowledge and care ordinarily possessed and exercised by members of [the medical] profession under similar circumstances." *Barris v. Cnty. of Los Angeles*, 20 Cal. 4th 101, 108 (1999). Typically, the relevant standard of medical care is "peculiarly within the knowledge of experts," *Sinz v. Owens* 33 Cal. 2d 749, 753 (1949), so objective medical opinion or independent testimony—even if disputed—is needed to "prove or disprove that the defendant performed in accordance with the standard of care." *Johnson*, 143 Cal. App. 4th at 305. Only in the rarest of cases where medical negligence might be obvious to a layperson can a plaintiff in a medical malpractice case proceed to trial with no expert medical evidence on the predicate standard of care needed to establish duty and breach. *See Powell v. Kleinman*, 151 Cal. App. 4th 112,

123 (2007).

Plaintiff claims that Gomez committed malpractice by performing a painful IO-infusion procedure on his leg without first attempting to place an IV-line in his arm while he was unconscious. But the standard of care for a specialized emergency medical procedure—like IO-infusion—"is not within the common knowledge of laymen." *Bushling v. Fremont Med. Ctr.*, 117 Cal. App. 4th 493, 509 (2004). So expert medical opinion about whether and when a paramedic should perform an emergency IO-infusion procedure—especially on a patient with plaintiff's unique medical history who had seized to unconsciousness—is indispensable to proving medical negligence. *Compare, e.g., Gero v. United States*, 808 F. App'x 516, 517 (9th Cir. 2020) (expert opinion required to show failure to properly diagnose and treat plaintiff's knee condition was negligent)*, and Holtshouser v. United States*, 595 F. App'x 687, 688–89 (9th Cir. 2014) (expert testimony required to establish standard of care for nurse practitioner claimed to have negligently dispensed drug to patient)*, with, e.g., Flowers v. Torrance Mem'l Hosp. Medical Ctr.*, 8 Cal. 4th 992, 1001 (1994) (breach of duty deemed evident without expert when surgeon left scalpel in patient's body after surgery)*, and Ybarra v. Spangard*, 25 Cal. 2d 486, 487–90 (1944) (no expert required to prove medical malpractice when plaintiff suffered unrelated shoulder injury during appendectomy).

Yet plaintiff has adduced no such expert medical evidence or testimony here. He cannot meet this burden of production by just pointing to nonclinical remarks he claims to have overheard from one or more DVH medical staff while he was being provided emergency care at the hospital on the day in question. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts."). Nothing

in the record suggests that any of these staff had the factual basis, much less the relevant expertise, to offer admissible trial testimony about the medical standard of care for IO-infusion procedures in the emergency scenario that Gomez was presented. *See California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1149 n.4 (9th Cir. 2011) ("An expert's opinions that are without factual basis . . . are inadmissible at trial and are inappropriate material for consideration on a motion for summary judgment."). As percipient witnesses, they could presumably attest to facts about placing an IV-line in plaintiff and caring for the site of the IO-infusion. But the mere fact that a bystander (even if medically trained) may have questioned whether the IO-infusion procedure was necessary—or that someone made an off-the-cuff comment that it was medical malpractice to have performed the procedure—cannot meet plaintiff's burden to establish an objective standard of medical care that a jury will need to reliably decide whether Gomez was negligent in how he administered emergency fluids to plaintiff right after his seizure in prison.

Nor can plaintiff rely on evidence from Gomez himself to establish the pertinent standard of care. In his declaration, Gomez implies (according to a BOP policy that is nowhere in the record) that an IO-infusion procedure might be medically acceptable if a traditional IV-line has been attempted but cannot be placed intravenously. At the same time, Gomez's contemporaneous medical notes indicate that he tried—but failed—to place an IV-line twice before resorting to the IO-infusion procedure when he treated plaintiff after his seizure. Among that evidence, plaintiff cannot cherry-pick what he likes and ignore the rest. Either Gomez's sworn statements reliably establish a relevant standard of care, in which case his medical notes then confirm that he acted in accordance with that standard. Or, given the obvious conflict of interest, Gomez can neither establish the

15

objective standard of care for his own medical performance nor rely on medical notes that he himself evidently never even looked at when making his sworn statements. Plaintiff cannot, however, ask the court to credit Gomez's sworn statements only as far as they might establish the relevant standard of care (ostensibly in plaintiff's favor) but then to discredit the facts in Gomez's medical report—indicating he met that standard—as a "lie."

In the end, unless there is objective and independent evidence in the record establishing the predicate standard of care for whether (and when) an IO-infusion procedure is medically appropriate, it doesn't matter if there remains a conflict between plaintiff's and Gomez's accounts about whether (or how many times) an IV-line was attempted on plaintiff before the IO-infusion procedure Gomez administered. Perhaps no IV-line needed to be tried under the circumstances that Gomez faced with a patient in plaintiff's condition who had his medical history. Or perhaps more than even two attempts at placing IV-lines needed to be tried first for a patient like plaintiff. The point is no lay jury can decide that issue without some baseline expert medical opinion or testimony about the standard of care for IO-infusion procedures in the situation presented here—evidence which neither Gomez nor plaintiff has supplied.[4] But since it is plaintiff's burden ultimately to prove all the elements of his medical negligence claim—including duty and breach—the lack of that evidence means that summary judgment on this claim must be entered for defendant.

---

[4] Thus, to be clear, this is not a situation in which defendant has presented—through Gomez himself—uncontroverted expert testimony about the relevant medical standard of care. *See Doe v. Good Samaritan Hosp.*, 23 Cal. App. 5th 653 657 (2018) (defendant's burden on summary judgment "cannot be satisfied by an expert declaration consisting of ultimate facts and conclusions that are unsupported by factual detail and reasoned explanation, even if it is admitted and unopposed"); *Kelley v. Trunk* 66 Cal. App. 4th 519, 525 (1998) (defendant's burden on summary judgment is not met by "laconic expert declarations which provide only an ultimate opinion, unsupported by reasoned explanation").

## IV.
## CONCLUSION

For all these reasons, the court recommends that defendant's motion for summary judgment be denied as to the assault and battery claims and granted as to the medical malpractice claim. *See* 28 U.S.C. § 636; G.O. 05-07.

DATED: January 29, 2025

STEVE KIM
United States Magistrate Judge